

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 26, 2020

**VIA ECF**

The Honorable J. Paul Oetken
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

Re:     *United States v. Jevgeni Bokov*, 18 Cr. 678 (JPO)

Dear Judge Oetken:

The Government respectfully submits this letter in advance of the sentencing of the defendant, Jevgeni Bokov, who pled guilty to two counts of money laundering, in violation of 18 U.S.C. § 1956. The defendant's United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range, as calculated by the Probation Department and as the parties agree, is 70 to 87 months' imprisonment (the "Guidelines Range"). The defendant is a sophisticated international criminal who laundered hundreds of thousands of dollars of what he understood to be the proceeds of Colombian cocaine trafficking from Europe to the United States. For the reasons that follow, the Government submits that a sentence within the applicable Guidelines Range would be sufficient, but not greater than necessary, to achieve the goals of sentencing.

## Background

### I.     Offense Conduct

The Drug Enforcement Administration ("DEA") Special Operations Division's Bilateral Investigations Unit ("BIU") partners with foreign law enforcement to investigate and disrupt significant international criminal activities, including narcotics trafficking, arms trafficking, and money laundering. The DEA and other law enforcement agencies sometimes rely on sting operations as an investigative technique to identify, infiltrate, and ultimately disrupt criminals operating in this country and abroad, particularly as members of such criminal networks use increasingly sophisticated cyber tools and encrypted applications to conceal their illicit activities.

In 2017, the BIU and Estonian National Criminal Police ("ENCP") began investigating Amid Magerramov and Jevgeni Bokov for their involvement in Estonian organized crime, drug trafficking, and money laundering. (Presentence Investigation Report dated Mar. 20, 2020 ("PSR"), ¶ 18). As described below, in the course of the investigation, Bokov laundered over $275,000 in purported cocaine trafficking proceeds via illicit wire transfers through entities in Europe to banks in the United States. In parallel, Magerramov and a team of associates worked

together to supply large quantities of carfentanil—a fentanyl analogue that, like fentanyl, is a synthetic opioid far more potent than heroin that can be lethal in small doses—for importation into the United States.  As of at least June 2018, Bokov was aware of, and assisted with coordinating financial payments in furtherance of, the fentanyl importation conspiracy.

### A.  Bokov's Laundering of Over $275,000 in Purported Cocaine Proceeds

#### 1.  The October 2017 Meetings

As of October 2017, the BIU and ENCP had identified Magerramov as a target of the investigation involved in Estonian organized crime.  (DX 23 (DEA Rpt. of Oct. 13-14, 2017 Mtgs.) at 1).[1]  On October 13, 2017, a DEA confidential source (the "CS") met at a restaurant in Tallinn, Estonia with Magerramov and multiple associates, including Lauris Kaminskis, an individual ENCP knows to be involved in Estonian organized crime.  (*See id.* at 1-2).  The following night, October 14, 2017, the CS met at a mixed martial arts event in Tallinn with Magerramov and Kaminskis, who were accompanied by Bokov, who was also known to Estonian authorities as a fixture in Estonian organized crime and an experienced money launderer.  (*Id.* at 2; PSR ¶ 108 (law enforcement authorities in Estonia informed Probation Department, in response to Probation Department's independent inquiry into Bokov, that "subject is known to police long time for crimes related to organized crime, large scale money laundering and narcotics offenses")).  The CS was posing as a member of a Colombian drug trafficking organization (the "DTO") that imported narcotics into the United States and needed assistance laundering the drug proceeds. (PSR ¶ 21).

In the course of the meeting (which was unrecorded), Bokov informed the CS that in late 2016, law enforcement in Colombia had seized approximately 400,000 euros in cash from Bokov in Colombia, and Bokov asked if the CS could help retrieve the money.  (PSR ¶ 21; DX 23 at 2-3).  Law enforcement inquiries confirmed that on November 12, 2016, Colombian authorities seized over 400,000 euros in undeclared currency from Bokov at the airport in Bogota, and Bokov was charged with money laundering, but was subsequently released because Colombian authorities failed to provide an Estonian translator within 36 hours, as required by local law.  (PSR ¶ 21 & n.4; DX 23 at 3).  At the conclusion of the meeting on October 14, 2017, the CS and Bokov exchanged contact information and agreed to meet again soon to discuss doing business together. (PSR ¶ 21).

---

[1] "DX" refers to the exhibits attached to the defendant's sentencing memorandum, dated June 16, 2020 ("Def. Mem.").  The defendant has moved to file the entirety of his sentencing submission under seal, citing the professed need to protect the confidential nature of the Government's investigation and evidence.  (Dkt. 83).  But the Government does not object to the public docketing of the information and materials in the defendant's submission (indeed, the Government has publicly filed numerous transcripts, investigative reports, and other evidence in connection with prior submissions in this case (*see, e.g.*, Dkt. 77), and respectfully submits that there is no basis for sealing the defendant's submission.  To the extent the submission contains a limited amount of sensitive personal information properly redacted in accordance with Federal Rule of Criminal Procedure 49.1, the defense should publicly file a redacted version of the submission.

About a week later, on October 20, 2017, the CS met with Bokov in Barcelona, Spain, to discuss engaging in a money laundering transaction for the DTO. (PSR ¶¶ 22-24; DX 26 (DEA Rpt. of Oct. 20, 2017 Mtg.); DX 27 (Tr. of Oct. 20, 2017 Mtg.)). During that recorded meeting, the CS and Bokov discussed in explicit terms the DTO's large-scale cocaine trafficking business, and that the DTO needed Bokov's assistance with moving bulk quantities of narcotics proceeds from Europe back to Colombia via companies based in the United States. (DX 27 at USAO_00051-52 (CS twice explicitly used the word "cocaine" and explained that the DTO shipped its cocaine by the "ton" using "boat" and "plane" generating large quantities of cash)). The CS conveyed that the DTO was looking to launder as much drug money as possible, as quickly as possible ("I want from you what is possible"), and Bokov responded, "It is possible." (*Id.* at USAO_00052). The CS explained that the DTO needed to move millions of euros worth of drug proceeds at a time, and he and Bokov engaged in the following exchange:

> CS: But when I'm waiting, another shipment coming, so now, before I have five to go, but now I have more coming so I have fifteen. So I have to move five, and I have ten now waiting. You understand?
>
> BOKOV: Yes, yes.
>
> CS: I have always more waiting then the speed I can bring it out.
>
> BOKOV: Ok.
>
> CS: And that generate a problem for us.
>
> BOKOV: For me, if I can, I help you.
>
> CS: Mhmm.
>
> BOKOV: But we must speak.
>
> CS: Yeah, yeah, of course.
>
> BOKOV: I only want. I don't know.
>
> CS: But you understand what I say?
>
> BOKOV: I understand. But I don't want to know what (logistica). I don't want that.
>
> CS: Yeah.
>
> BOKOV: Only do the cash. I do it.
>
> CS: Mhmm. Ok.

BOKOV: Your information. My information.

CS: Yeah, I understand.

BOKOV: Is good for you. Is good for me.

(*Id.* at USAO_00052-53).

In this exchange, Bokov confirmed that he would "help" the DTO move its drug proceeds, and that he understood the nature of the DTO's cocaine trafficking business ("I understand"), which the CS had described in detailed terms. Bokov cautioned the CS, however, that he did not "want to know" more about the DTO's cocaine operations, and that moving cocaine was the CS's end of the business, while laundering the proceeds was Bokov's area of expertise ("Only do the cash. I do it. . . . Your information. My information."). Bokov, a seasoned money launderer, explained that this arrangement would protect both the CS and Bokov: "Is good for you. Is good for me."

Bokov then assured the CS that he was capable of laundering five million euros per month, and that he would advise the CS if any issues arose:

BOKOV: If I, every month can do five million, is good for you.

CS: Yeah.

BOKOV: If there is some stop, I'll tell you.

(*Id.* at USAO_00053).

As the meeting continued, Bokov explained that he would launder the DTO's drug proceeds via wire transfers through companies in Europe to entities that the CS identified in the United States. (*Id.* at USAO_00053-54). Bokov again demonstrated his experience and sophistication as a money launderer, pressing the CS to confirm that the U.S. entities that would receive the narcotics proceeds were clean on paper, such that red flags would not be raised:

BOKOV: One question.

CS: Yes.

BOKOV: Do you have company?

CS: I have some company, yes.

BOKOV: This is company have some history bad?

CS: No, no bad.

BOKOV: Listen, maybe anything know bad about the company.

CS: Mhmm.

BOKOV: How you think?

CS: The company is good.

BOKOV: You're sure.

CS: Yeah, but we limit.

BOKOV: If my transaction from my company to this company, you're sure that your company is good?

CS: Yeah, is good.

BOKOV: Last, next I am back, we will talk.

(*Id.* at USAO_00053-54).

Bokov also explicitly warned the CS not to discuss their criminal venture with others, in order to avoid detection by Estonian law enforcement. (*Id.* at USAO_00054 ("But if you go to Estonia and speak to anyone about your business. . . . Is problem. Problem. 100%.")). Bokov conveyed that he was experienced in conducting criminal activities clandestinely in Estonia, stating that "police know about all" in Estonia, as it is a small country, but that the authorities "[d]on't know about me" (in fact, as noted above, Estonian authorities were well aware that Bokov was a prominent figure in Estonian organized crime, *see* PSR ¶ 108). (*Id.* at USAO_00054-55). Bokov emphasized that "the police are not stupid," and that he and the CS would need to operate carefully to evade detection. (*Id.* at USAO_00055).

## 2. Bokov's Execution of the First Money Laundering Transaction

Bokov met the CS in Tallinn on December 6, 2017, to conduct the first money laundering transaction for the DTO. (PSR ¶¶ 25-26; DX 28 (Tr. of Dec. 6, 2017 Mtg.)). The CS gave Bokov an envelope containing approximately 50,000 euros of the DTO's purported drug proceeds, which Bokov agreed to deposit and transfer, minus a commission, through entities in Europe to a particular bank account in Manhattan—which, unbeknownst to Bokov, was a DEA undercover account ("UC Account-1"). (PSR ¶¶ 26-27; DX 28 at USAO_00074-76). Bokov informed the CS that he could execute the transaction in a single day, and explained that in order to conceal the true origins of the illicit funds, Bokov would inform the bank initiating the transfer that the payment was for "equipment." (PSR ¶¶ 25-26; DX 28 at USAO_00074-77). Bokov and the CS also discussed their plan to engage in additional laundering transactions for the DTO in the future, if the initial 50,000-euro transfer was successful. (PSR ¶ 26; DX 28 at USAO_00074 (Bokov confirmed he would be prepared to execute additional transactions "right away" after the initial transaction)). Bokov and the CS did not explicitly discuss the source of the 50,000 euros, which was plainly understood based on their lengthy and detailed discussion about the DTO's cocaine trafficking operations during the October 20, 2017 meeting.

The following day, December 7, 2017, Bokov attempted to transfer the 50,000 euros, minus his commission, from a Bulgarian bank to UC Account-1. (PSR ¶ 27; GX 1 (DEA Rpt. of First

Money Laundering Transaction) at 2; GX 2 (DEA Rpt. of Dec. 14-15, 2017 Mtgs.) at 1-2).[2] However, as Bokov informed the CS when they next met on December 14, 2017, the transfer did not go through, apparently due to an issue with UC Account-1. (GX 1 at 2; GX 2 at 1-2). During the December 14 meeting (which was unrecorded, as the recording equipment malfunctioned), Bokov was frustrated that the money had not successfully transferred, and was eager to complete the transaction. (GX 2 at 1-2). On January 9, 2018, Bokov informed the CS that the transferred funds had been returned to his account at the Bulgarian bank as a result of the issue with UC Account-1, and that he needed a new recipient account in the United States to complete the wire transfer. (GX 1 at 2; PSR ¶ 28). That day, the CS provided Bokov with information for a different undercover bank account in Manhattan ("UC Account-2"). (GX 1 at 2).

Just three days later, Bokov successfully transferred the funds, minus a commission amounting to $5,456, to UC Account-2—laundering a total of approximately $56,144. (PSR ¶ 31; GX 1 at 2). To execute the transaction, Bokov used an account at a bank in Singapore held in the name of an Australian company, Maritime Engineering Services Pte. Ltd. ("Maritime Engineering"). (GX 1 at 2-3). Bokov claims that he worked for the company as a "broker" and "had a close working relationship with Maritime's management and had access to [the] company's financial accounts." (Def. Mem. at 16).

Bokov met again with the CS in Tallinn on January 15 and 17, 2018. (PSR ¶¶ 29-30; DX 31 (Tr. of Jan. 15, 2018 Mtg.); DX 32 (Tr. of Jan. 17, 2018 Mtg.)). In the course of those recorded meetings, Bokov confirmed that he would continue to launder money for the DTO, and expressed his desire to move the DTO's money more frequently, explaining that he had agreements with his bank "partner" that enabled him to transfer between 16 and 20 million euros every three months. (DX 31 at USAO_00108, 111 (Bokov stated that he does "very big . . . work," and wanted to "[t]ransfer, transfer, transfer, transfer")). Bokov conveyed that he had extensive experience illicitly transferring money internationally, including in the United States, and that he used various companies to execute the transactions. (DX 32 at USAO_00133 (Bokov informed CS that he had "very many company" and "[v]ery many . . . business partners"; that he worked with European, Asian, and American entities; and that "[i]t is very difficult . . . but we work in America")). Bokov and the CS discussed the logistics of future transfers for the DTO, including the possibility of Bokov opening accounts in the United States to facilitate his moving money for the DTO. (Id. at USAO_00138-142). Bokov agreed to launder at least 200,000 euros in the next transaction for the DTO. (Id. at USAO_00144). The CS also acknowledged that the delay in the completion of the initial 50,000-euro transaction was attributable to a "problem with our bank"—i.e., the U.S. bank where UC Account-1 was maintained—and not to Bokov. (Id. at USAO_00134-135).

### 3.  Bokov's Execution of the Second Money Laundering Transaction

Bokov next met the CS on March 7, 2018 in Tallinn. (PSR ¶¶ 32-33; DX 33 (Tr. of Mar. 7, 2018 Mtg.)). During that recorded meeting, Bokov agreed to execute another transfer of the DTO's cocaine proceeds from Europe to the United States. The CS told Bokov that he would give Bokov 200,000 euros the following week for transferring to the United States. (DX 33 at USAO_00431). Bokov also agreed that, after the 200,000-euro transaction was completed, he would continue laundering additional cash proceeds for the DTO. (Id. at USAO_00432 (Bokov

---

[2] "GX" refers to the Government exhibits attached to this letter.

agreed to execute subsequent transactions involving 500,000 and one million euros of drug proceeds)). The CS showed Bokov a piece of paper referencing "1,000 kgs cocaine," and explained that, from 1,000 kilograms of cocaine, the DTO would make 18 million euros that would need to be laundered. (*Id.* at USAO_00432-433 (CS advised that "from this thousand I have eighteen million available" and Bokov agreed to launder those funds); PSR ¶ 32). Bokov indicated that he planned to use "many company" to execute the 200,000-euro laundering transaction. (DX 33 at USAO_00439). Bokov reiterated his willingness to continue illicitly moving money for the DTO, and again raised the possibility of opening accounts in the United States to facilitate the transfers. (*Id.* at USAO_00434 ("I must open accounts in America . . . Is very important for me because . . . European bank have problems. European bank very, very bad. . . . If I have account in American bank . . . I can send money from my banker . . . and put it in your account.")).

On March 17, 2018, the CS met Bokov in Tallinn, and as previously agreed, the CS gave Bokov a bag containing approximately 200,000 euros in cash for transferring to UC Account-2, minus Bokov's commission. (PSR ¶ 34; DX 35 (Tr. of Mar. 17, 2018 Mtg.)). Bokov explained that he would use several different accounts at European banks to execute the transaction, including in the Czech Republic. (DX 35 at USAO_00496-498). Bokov again confirmed that he would continue laundering drug proceeds for the DTO going forward, in progressively larger quantities, starting with 500,000 euros and one million euros. (*Id.* at USAO_00493-495 (Bokov estimated that it would take about "one week" to launder 500,000 euros)).

Over the ensuing weeks, Bokov laundered the 200,000 euros, minus a commission amounting to $25,875, executing approximately six wire transfers through various banks in Europe to transfer a total of approximately $229,124 to UC Account-2. (PSR ¶ 35; GX 3 (DEA Rpt. of Second Money Laundering Transaction)). The accounts at the European banks were held in the names of various different entities, including Maritime Engineering. (PSR ¶ 35).

After completing this second money laundering transaction, Bokov met with the CS in Tallinn on April 20, 2018, and the meeting was recorded. (DX 37 (Tr. of Apr. 20, 2018 Mtg.)). The CS confirmed that Bokov had successfully transferred the 200,000 euros, minus his commission, to UC Account-2. (*Id.* at USAO_00619 (Bokov: "Are you see money?" / CS: "Yes, all there, is all there.")). The CS noted that there had been some delay ("it just took time") in Bokov's completion of the transfers, and Bokov explained that the time lag was attributable to the CS selecting a recipient account based in dollars (as opposed to euros). (*Id.* at USAO_00619-620 ("I tell you, it's not my problem. Is problem with your account because you give me dollar account.")). Bokov and the CS discussed ways to eliminate such delay in future transactions for the DTO. (*Id.* at USAO_00620-623). Bokov assured the CS that he was ready to launder millions of dollars in drug proceeds: "It's no problem for me, one million, two million, three million . . . no problem." (*Id.* at USAO_00624). Bokov agreed to launder 300,000 or 400,000 euros in the next transaction for the DTO. (*Id.*).

As the meeting continued, Bokov agreed to accompany the CS to Colombia to meet the DTO's "banker" and discuss coordinating the laundering of the DTO's proceeds. The CS explained, and Bokov acknowledged, the illicit business plan: "You [Bokov] wash the money here [Europe] for us, he [the banker] wash the money there [Colombia] for us." (*Id.* at USAO_00625-631). Bokov even agreed to visit the DTO's "[c]ocaine plantation" and gain a better understanding of the mechanics of the DTO's cocaine trafficking operations. (*Id.* at

USAO_00630-633).  In the course of their explicit discussion about the DTO's cocaine business, Bokov—who, as an experienced money launderer, was consistently mindful of maintaining operational security—asked the CS "[w]ho know about our, our contact?" and again cautioned the CS not to let others know about their ongoing criminal venture.  (*Id.* at USAO_00633-634).

## B.    Bokov's Role in the Fentanyl Importation Conspiracy

As described above, between October 2017 and April 2018, Bokov laundered over $275,000 of the DTO's purported cocaine trafficking proceeds, and planned to continue working to launder the DTO's money.  In parallel, Bokov's criminal associate, Amid Magerramov, led a crew of narcotics traffickers to produce and supply large quantities of carfentanil for the DTO to import into the United States.  (PSR ¶¶ 36-78).  In May 2018, Magerramov's crew supplied nearly six kilograms of carfentanil mixtures to the CS for importation into the United States.  (PSR ¶¶ 54-67).

Shortly after delivery of the carfentanil, on June 6, 2018, the CS met with Magerramov and co-defendant Vitali Voronjuk in Tallinn.  In the course of that recorded meeting, the parties agreed that, since Magerramov was traveling abroad the following day, the CS would work with Bokov to set up an account through which the CS would provide partial payment to Magerramov for the carfentanil that had been supplied.  (PSR ¶¶ 68-69).  As set forth above, Magerramov and Bokov were associates, and the CS first met and began working with Bokov through Magerramov. Magerramov and Voronjuk agreed that once they received payment from the CS, they would begin producing additional carfentanil for the DTO.  (PSR ¶ 69).

The next day, June 7, 2018, the CS met with Bokov in Tallinn.  (PSR ¶¶ 70-72; DX 38 (Tr. of June 7, 2018 Mtg.)).  At the outset of the recorded meeting, Bokov and the CS engaged in another lengthy, detailed discussion about the DTO's cocaine trafficking business, and Bokov confirmed that he was prepared to launder all of the DTO's drug proceeds in Europe.  (DX 38 at USAO_01817-1820).  The CS showed Bokov a diagram, which depicted the DTO's international cocaine shipping and money laundering routes, and referenced specific "kg" quantities of "cocain" and corresponding amounts of proceeds in euros.  (*Id.* at USAO_01823; DX 39).  Bokov and the CS agreed that, going forward, Bokov would transfer at least two million euros in drug proceeds for the DTO per month from Europe to the United States and other countries.  (DX 38 at USAO_01822-1823).

The CS then raised the ongoing fentanyl importation business with Magerramov.  (*Id.* at USAO_01846).  The CS informed Bokov that Magerramov and his "crew" had recently traveled to Denmark to "manufacture this," pointing to a photo on the CS's phone of the carfentanil supplied by Magerramov's crew, and the CS asked Bokov, "You know this shit?"  (*Id.* at USAO_01848).  Bokov confirmed that he did.  (*Id.*).  The CS explained that Magerramov's crew had found a place in Denmark to make the drugs, and supplied the drugs to the DTO, which was shipping the product for distribution.  (*Id.* ("So they went, we found them a place in Demark and they make it, and they give it to us, we send it.")).  The CS told Bokov that the DTO's "chemist" had tested the "fentanyl" supplied by Magerramov a "few days ago," that it was "good" quality, and that even small amounts of the product could be cut to yield larger quantities for distribution. (*Id.* at USAO_01852, 1854).  The CS further informed Bokov that the CS owed Magerramov "600,000 dollars" for the "5.2" kilograms of fentanyl Magerramov had supplied, and that the plan

was for the DTO to continue receiving fentanyl from Magerramov's crew. (*Id.* at USAO_01851). Bokov acknowledged his understanding that, going forward, Magerramov would continue supplying fentanyl, while Bokov would launder the proceeds ("run just the money")—two distinct but interdependent components of the fentanyl importation scheme. (*Id.* at USAO_01852-1853). The CS stated that "we are all the same crew in one way," "we all work together, but different places," and Bokov responded, "Uh-hum." (*Id.* at USAO_01853). During this extended conversation, the CS used the word "fentanyl" three times, Bokov continuously affirmed that he understood, and the diagram referenced above that the CS showed Bokov also contained the word "FENTANYL" in all capital letters. (*Id.* at USAO_01846-1868; DX 39).

The CS informed Bokov that Magerramov was traveling to Greece, and asked Bokov to help transfer payment to Magerramov for the drugs that he had supplied. (*Id.* at USAO_01863-1869). Bokov agreed to receive payment for Magerramov for "the work he did for us"—a reference to Magerramov's production of fentanyl for the DTO, which the CS and Bokov had just discussed at length. (*Id.* at USAO_01866). The CS stated: "[L]ike I told you I have to give him [Magerramov] money for, for the . . . you know. Because in reality for the fentanyl I have to give him like six hundred thousand. So I just want to give twenty thousand right now to the wife!" (*Id.* at USAO_01868). Bokov agreed to transfer the funds from the CS to Magerramov. Later that day, the CS met with Magerramov, Voronjuk, and co-defendant Viktor Litvintsuk, and confirmed that the DTO would transfer payment through Bokov to Magerramov's crew for the carfentanil they had supplied. (PSR ¶ 73).

On July 17, 2018, Magerramov provided the CS via text message with information for a bank account controlled by Magerramov, for purposes of Bokov transferring the DTO's payment to Magerramov. (PSR ¶ 74; DX 45). Later that day, the CS transferred approximately $20,000 to a bank account controlled by Bokov. (PSR ¶ 75). The next day, July 18, 2018, the CS and Bokov exchanged text messages, during which Bokov confirmed that he had received the money, and the CS provided Bokov with Magerramov's account information for purposes of transferring the funds to Magerramov as previously agreed. (PSR ¶ 75; DX 46). Bokov also agreed to save Magerramov's account information for future transactions, and to transfer an additional payment of $100,000 from the DTO to Magerramov, minus a $10,000 commission for Bokov. (PSR ¶ 75; DX 46). Bokov thereafter transferred the $20,000—minus a $5,000 payment for himself—to Magerramov, who confirmed receipt of the payment. (PSR ¶ 77).

Several days later, on July 23, 2018, the CS informed Bokov via text message that the DTO had approximately $650,000 in cash stored at an apartment in Spain, for purposes of providing to Magerramov. (PSR ¶ 76; DX 47). Bokov agreed that he would retrieve the $650,000 after receiving a key from the CS, and then transfer the $650,000 to Magerramov as further payment "for the work he did"—another reference to Magerramov's supplying fentanyl to the DTO, which Bokov and the CS had previously discussed at length. (PSR ¶ 76; DX 48). Later that day, the CS and Magerramov exchanged text messages, during which Magerramov advised that once Bokov transferred the $650,000 to Magerramov, the crew would begin preparing additional carfentanil for the DTO. (PSR ¶¶ 76-77; DX 47 ("we can start work")).

## II.     Procedural History and the PSR

The defendant was arrested, along with co-defendants Magerramov, Voronjuk, and Nikolai Niftalijev, on September 4, 2018 in Estonia.[3]  (PSR ¶¶ 82-83).  He was extradited to this District on May 9, 2019 to face the charges in indictment 18 Cr. 678 (JPO) (the "Indictment").  (PSR ¶ 82).  The Indictment charged Bokov with one count of conspiring to import fentanyl and carfentanil into the United States, in violation of 21 U.S.C. §§ 963, 952, 959, and 960 (Count One); and two counts of laundering funds represented to be the proceeds of narcotics trafficking, in violation of 18 U.S.C. § 1956(a)(2) and (a)(3) (Counts Four and Five).  (Dkt. 8).

On December 20, 2019, Bokov pled guilty to Counts Four and Five of the Indictment, pursuant to a plea agreement dated November 18, 2019 (the "Plea Agreement").  (PSR ¶ 9).  The parties stipulated in the Plea Agreement to a Guidelines range of 87 to 108 months' imprisonment, based on an offense level of 29 and a Criminal History Category of I.  (PSR ¶ 10).

The PSR calculates, and the parties agree, that the applicable Guidelines Range is 70 to 87 months' imprisonment.  (PSR ¶¶ 10, 89-105, 140-41 (explaining that the two-level enhancement under U.S.S.G. § 2S1.1(b)(2)(B) was erroneously included in the Plea Agreement, since—as the parties stipulated in the Plea Agreement—the four-level enhancement under § 2S1.1(b)(2)(C) applies because the defendant was in the business of laundering funds)).  As set forth in the PSR, the Probation Department addressed and resolved a series of objections from defense counsel.  (PSR at 29-35 (largely rejecting defense counsel's objections, many of which were directly contrary to the unambiguous content of the transcripts of Bokov's recorded meetings with the CS)).

The defendant requests a sentence of 24 months' imprisonment, amounting to time served.  (Def. Mem. at 1).  The Probation Department recommends a sentence of 70 months' imprisonment, citing the seriousness of Bokov's conduct—laundering hundreds of thousands of dollars in purported cocaine proceeds and coordinating payments for the production of fentanyl—as well as Bokov's prior money laundering conduct, his transparent attempts to minimize his culpability, and the fact that he was previously convicted of attempted murder in Estonia.  (PSR at 38-39).

### Discussion

As explained below, a substantial sentence of incarceration, within the applicable Guidelines Range of 70 to 87 months, is necessary in this case to reflect the seriousness of the defendant's conduct, to impose just punishment and promote respect for the law, and to achieve adequate specific and general deterrence.  *See* 18 U.S.C. § 3553(a).  The defendant's submission is a meandering and factually misleading attempt to minimize his culpability, and does not provide any basis for varying downwards from the Guidelines Range.

*First*, a sentence within the Guidelines Range is warranted in light of the nature and seriousness of the defendant's crimes, his history and characteristics, and the need to afford just

---

[3] Litvintsuk was arrested in Estonia on September 5, 2018 and extradited to this District in February 2019.  (PSR ¶ 84).

punishment. The defendant engaged in a concerted, determined, and sophisticated effort, over the course of many months, to launder hundreds of thousands of dollars of what he clearly understood to be the proceeds of a Colombian DTO's international cocaine trafficking. And he was eager to continue laundering millions of dollars of the DTO's drug proceeds going forward, all to line his own pockets.

The defendant's submission repeatedly attempts to minimize his culpability—calling into serious question his acceptance of responsibility, *see* U.S.S.G. § 3E1.1—suggesting that he lacked knowledge about the funds he laundered, or was somehow entrapped. As the mountain of evidence recounted above and in the PSR makes clear (including the very transcripts attached to the defendant's submission), these assertions are divorced from the factual reality of this case. Over the course of numerous recorded meetings, including on October 20, 2017; March 7, 2017; April 20, 2018; and June 7, 2018, Bokov and the CS discussed, at great length and in explicit detail, the DTO's cocaine trafficking operations and that Bokov was assuming the role of the DTO's go-to launderer in Europe. Those conversations included repeated references to "cocaine," "kilograms," shipping routes, quantities of drug proceeds, and the need to "wash" and "clean" the money; the CS showed Bokov a diagram depicting the DTO's cocaine distribution routes; and Bokov even agreed to meet with DTO members in Colombia and visit the DTO's "[c]ocaine plantation." This is not a money laundering case where the defendant's knowledge of the illicit source of the funds is inferential or circumstantial; Bokov discussed and embraced that he was laundering drug proceeds for a Colombian cartel. (*See* PSR at 38 ("[T]he defendant coordinated the laundering of hundreds of thousands of dollars from Europe to the United States knowing that the money was proceeds from narcotics distribution. . . . Bokov's contention that he was unable to confirm that the funds were actually from narcotics sales appears to minimize, at least to himself, his full involvement in the instant offense.")).

The defense submission's allusions to "entrapment" and "outrageous government conduct" (Def. Mem. at 33-35) are beyond the pale. Far from being lured or pressured into committing crimes, Bokov never hesitated, jumping at the opportunity to launder massive amounts of money for the DTO. The explanation for that is readily apparent. He is an experienced money launderer. That is his business. Bokov eagerly engaged in numerous, lengthy meetings in multiple countries with the CS in furtherance of the money laundering scheme, explicitly planning and discussing the criminal venture. And this was not a fleeting foray into criminal activity; he worked to execute the illicit transactions over the course of many months. Indeed, even when logistical issues arose with the transfers, he was not deterred, but pressed forward in a determined effort to complete the transactions and pocket his commissions. Bokov's criminal conduct was unhesitating, relentless, and extended. This was anything but a one-time "mistake."

To the contrary, at every step of the way, Bokov's status as an experienced and sophisticated money launderer was evident: Bokov was introduced to the CS by Magerramov, a prominent figure in Estonian organized crime; Bokov repeatedly warned the CS to be discrete and maintain operational security in order to avoid law enforcement detection; he demonstrated his familiarity with Estonian police and their capabilities; he "repeatedly advised [the CS] that [he] had several businesses and accounts that were used to launder millions of dollars throughout various European companies" (PSR ¶ 79); he then in fact used an array of bank accounts in Europe and Asia, held in the names of various entities, to execute the laundering transactions (and the delays in executing the transactions were attributable at least in part to issues with the undercover

accounts, not Bokov); he pressed the CS to confirm that the recipient U.S. accounts were clean, such that red flags putting him at risk of detection would not be raised; he knew to disguise the source of the funds as something innocuous, like "equipment"; and he was willing to and did travel to different countries to meet with the CS to plan and execute the criminal venture.

Further evidencing Bokov's established involvement in the money laundering world, he narrowly escaped law enforcement's grasp in 2016 in Colombia, when he was arrested at the Bogota airport with over half a million dollars in cash in apparent drug proceeds and charged with money laundering, but later released on a technicality. Bokov's convoluted claim that he was paying back a legitimate loan is wholly incredible and indicative of his efforts to avoid taking responsibility for the true scope of his criminal conduct. (*See* PSR ¶ 107; Def. Mem. at 35-37). Bokov—who agreed without hesitation in this case to launder the cocaine proceeds of a Colombian drug cartel—arrived at the airport in Bogota carrying 400,000 euros in cash, which he did not declare to customs, and when arrested and questioned, he was unable to validate the source of the money. The explanation is not complicated—Bokov was laundering drug proceeds from Colombia, just as he worked to launder Colombian drug proceeds in this case.[4] Bokov was in the business of money laundering, motivated by greed (*see* PSR at 38), and perfectly willing and accustomed to partnering with drug traffickers to line his pockets. (*See* PSR ¶ 131 (Bokov claimed that prior to his arrest, he worked as an "agent" for "trading companies" in Europe and Asia for seven years, brokering transactions involving "fruit, vegetables, electronics, and construction materials," an apparent front for his money laundering activities)).[5]

A substantial portion of the defendant's submission is devoted to arguing that he was not involved in the Magerramov-led conspiracy to import fentanyl into the United States. As an initial matter, the defendant did not plead guilty to the fentanyl conspiracy charged in Count One, the applicable Guidelines Range derives solely from the money laundering conduct underlying the

---

[4] The defendant's suggestion that his dealings with the CS were motivated principally by his desire to recoup the 400,000 euros seized in Colombia does not withstand scrutiny. While Bokov discussed retrieving those funds with the CS on a handful of occasions, the transcripts attached to the defendant's submission make abundantly clear that the purpose of their meetings, and the primary subject discussed during their hours and hours of conversation, was working together to launder bulk quantities of drug proceeds for the DTO. Moreover, that the defendant asked the CS for help retrieving the funds seized in Colombia only further highlights his criminal savvy—Bokov believed that he was speaking with a representative of a Colombian DTO with corrupt ties to Colombian authorities, and sought to take advantage of that opportunity to recover proceeds from his prior money laundering activities.

[5] To the extent the defendant attempts to suggest at sentencing that the enhancement under U.S.S.G. § 2S1.1(b)(2)(C) for being in the business of money laundering does not apply (*see* Def. Mem. at 41-42), that would constitute a breach of his Plea Agreement. *See* Plea Agrmt. at 2 (stipulating that § 2S1.1(b)(2)(C) applies); *id.* at 3 ("[N]either party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either party in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines.")). In any event, and as the Probation Department concluded, the enhancement plainly applies in light of the defendant's involvement in the business of money laundering, as described above. (PSR ¶ 93).

two counts to which he did plead guilty, and the seriousness of that conduct alone, as described herein, supports imposing a Guidelines sentence. Nor has the Government ever alleged that Bokov produced or supplied fentanyl. But as the transcripts and other evidence discussed above make clear, as of June 2018, Bokov was aware of, and assisted with coordinating payments for, Magerramov's prior and anticipated future production of fentanyl for the DTO. Among other things, during the June 7, 2018 meeting, the CS and Bokov discussed that Magerramov's crew had supplied fentanyl to the DTO; the CS used the word "fentanyl" three times, showed Bokov a diagram depicting the DTO's business that included a reference to "FENTANYL," and showed Bokov a photo of the carfentanil supplied by Magerramov's crew; and Bokov acknowledged that he understood, and agreed to—and he later did—transfer funds from the CS to Magerramov as payment for those drugs. Bokov also agreed to transfer over half a million dollars in cash stored at an apartment in Spain to Magerramov as further payment for the drugs, and to continue acting as a go-between for payments from the DTO to Magerramov in the future.

As the foregoing facts make plain, any suggestion that Bokov did not realize he was facilitating the financing of Magerramov's supply of fentanyl to the CS—or that he thought Magerramov's business with the CS was limited to "resale of watches" (Def. Mem. at 30)—is simply untenable. As the Probation Department concluded, Bokov "coordinated with his co-defendants to assist a confidential source in providing money for fentanyl sales," and "[w]hile he has not been held accountable for drug distribution, it is impossible to ignore that he was . . . involved in conversations where fentanyl distribution deals were discussed," and "[t]he defendant's version of the facts also does not appear to correlate with his numerous conversations in which fentanyl was discussed." (PSR at 38; *see* PSR at 35 ("Based on the . . . transcripts in which fentanyl was discussed, . . . Bokov initially believed the Colombia drug cartel was distributing cocaine, but later became aware that fentanyl was being trafficked. . . . Bokov's conduct, specifically laundering money, perpetuated the conspiracy and allowed the drug distribution to continue.")). By June 2018, Bokov had been working to launder the DTO's cocaine proceeds for over seven months; it defies logic to suggest that he was not fully aware he was facilitating drug trafficking when he agreed to transfer hundreds of thousands of dollars from the DTO to Magerramov. In short, the defense submission's portrayal of the defendant as a good citizen whose conduct in this case was an aberration, is transparently false. As the defendant's conduct demonstrates, and as the Probation Department recognized, the defendant is a sophisticated international launderer of narcotics proceeds, and he should be sentenced accordingly.[6]

---

[6] Following his extradition, the defendant met with the Government, pursuant to a proffer agreement, in a purported attempt to cooperate with law enforcement. The Government cut the meeting short after a brief period, as it was immediately clear that Bokov was grossly minimizing his culpability and involvement in the charged conduct, including the extent of his money laundering capabilities and his knowledge of his co-defendants' fentanyl trafficking activities. (*See* Def. Mem. at 12 (misleadingly describing the aborted proffer as a meeting to "discuss the case")). Bokov also made clear that he was not willing to meet with Estonian law enforcement, which was of course his right but also telling, as that would have required Bokov to acknowledge his involvement in criminal activities known to Estonian authorities. (*See* PSR ¶ 108).

*Second*, a substantial sentence of imprisonment within the Guidelines Range is warranted to achieve adequate specific and general deterrence to criminal conduct. With respect to specific deterrence, such a sentence is necessary to deter the defendant—an established, experienced money launderer—from returning to that criminal conduct and livelihood when he is ultimately released and deported to Estonia (just as he did when he was released following his 2016 arrest in Colombia). Such a sentence is also warranted in light of the defendant's disturbing criminal history in Estonia. In 2003, Bokov was convicted of attempted murder and sentenced to eight years' imprisonment, based on his hiring a hitman to kill his father's alleged murderer. (PSR ¶ 106 (hitman hired by Bokov shot the target multiple times, but the victim survived; Bokov served six and a half years in prison)). Had Bokov sustained that attempted murder conviction in the United States, and contrary to the defendant's incorrect analysis of the Guidelines (*see* Def. Mem. at 39), Bokov would have three criminal history points, placing him in Criminal History Category II and yielding a higher Guidelines range of 78 to 97 months' imprisonment. *See* U.S.S.G. § 4A1.2(e)(1) (Bokov's prior sentence would count for criminal history points both because it was imposed (in 2003) within 15 years of commencement (in 2017) of the instant offense, and because it resulted in Bokov being incarcerated within 15 years of commencement of the instant offense). Indeed, the Probation Department concludes that an upward departure pursuant to U.S.S.G. § 4A1.3 may be warranted because Bokov's Criminal History Category of I underrepresents the seriousness of his criminal history and that, at the very least, Bokov's criminal history militates firmly against any sentence reduction below the applicable Guidelines Range of 70 to 87 months. (PSR at 38-39, ¶ 159).

General deterrence also is an important consideration in this case, further supporting the imposition of a Guidelines sentence. Laundering the illicit proceeds of the international drug cartels that are poisoning communities in this country is an essential component of those cartels' business model and operations. Drug trafficking organizations need and rely upon the services of criminals, like Bokov, who are willing and able to "clean" dirty drug money, in order for the cartels to effectively conduct their business and move their product. It is imperative that the sentence in this case conveys the appropriate message that, when caught, those individuals will face severe penalties commensurate with their integral role in the international drug trafficking trade. A sentence reduction, or the slap on the wrist proposed by the defendant, would send a message wholly at odds with the deterrence purposes of sentencing.

Finally, contrary to the defendant's conclusory argument (*see* Def. Mem. at 45-48), the ongoing COVID-19 pandemic does not in any way justify a reduced sentence, particularly given that the defendant does not have any underlying health condition placing him at greater risk for complications if he contracted the virus. This Court is now well-familiar with the reasonable, appropriate, and extensive steps that the Bureau of Prisons ("BOP") has taken and is taking to combat the spread of the virus, and those measures have been largely successful in mitigating the

impact of the virus within the federal prison system. *See* https://www.bop.gov/coronavirus.[7] The defendant's reliance on decisions granting so-called compassionate release under 18 U.S.C. § 3582(c) is completely misplaced, as the defendant does not—unlike the inmates in those cases—suffer from a severe medical condition constituting "extraordinary and compelling" reasons for release; quite the opposite, the defendant is a 45-year-old black belt in karate who appears to be in perfect health. (PSR ¶¶ 122-23). Moreover, the defendant has not yet been designated to a particular facility to serve his sentence, and many of the federal facilities around the country where he might serve his sentence have had very few or even zero inmates test positive, while by contrast the virus continues to spread in countries around the world. *Cf. United States v. Nunez*, No. 20 Cr. 239 (ER) (S.D.N.Y. Apr. 10, 2020) ("[B]ecause there is a pandemic does not mean that the jailhouse doors ought to be thrown open.").

Accordingly, for the reasons set forth above, the Government respectfully submits that a sentence within the applicable Guidelines Range of 70 to 87 months' imprisonment would be sufficient, but not greater than necessary, to achieve the objectives of sentencing.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By: _____/s/_____
Shawn G. Crowley / George D. Turner
Assistant United States Attorneys
(212) 637-1034 / 2562

cc: Igor Litvak, Esq. (by ECF and email)

---

[7] *See also BOP COVID-19 Action Plan*, https://www.bop.gov/resources/news/20200313_covid-19.jsp, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp; *Module 1: Surveillance and Infection Control*, https://www.bop.gov /resources/pdfs/pan_flu_module_1.pdf; *Module 2: Antiviral Medications and Vaccines*, https://www.bop.gov/resources/pdfs/pan_flu_module_2.pdf; *Module 3: Health Care Delivery*, https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf; *Module 4: Care for the Deceased*, https://www.bop.gov/resources/pdfs/pan_flu_module_4.pdf.